Thomas J. Hare, Jr., Transferee of Assets of Atlantic Paper Company v. Commissioner.
Hare v. Commissioner
Docket No. 8062.
United States Tax Court
1951 Tax Ct. Memo LEXIS 94; 10 T.C.M. (CCH) 940; T.C.M. (RIA) 51296; September 25, 1951
*94 Petitioner, a transferee of a corporation's assets, contested liability of corporation. Held, respondent did not err in determining reasonable salaries of officers of corporation. Held, further, that amount of overdraft charged to president's account at date of his death, he being insolvent, was deductible as a bad debt. Humbert B. Powell, Esq., 2124 Lincoln-Liberty Bldg., Philadelphia, Pa., for the petitioner. William H. Best, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: In this proceeding petitioner, as transferee, contests respondent's determination of the liability of Atlantic Paper Company, a corporation, for taxes for the calendar years 1941 and 1942. Deficiencies of the corporation were determined as follows: 1941
1942
Income Tax
$5,650.21
Declared Value Excess Prof-
its Tax
3,579.01
$ 1,156.19
Excess Profits Tax
9,666.47
51,314.39 The value of the transferred assets is stipulated and petitioner concedes that he is liable as a transferee for taxes owed by the corporation. After certain concessions by respondent the issues remaining for our determination are the amounts *95 of salaries of the officers of the corporation deductible as business expenses in the taxable years and whether an amount overdrawn by the president of the corporation is deductible in 1942 as a bad debt after the president died in that year. Findings of Fact Petitioner is an individual residing in Wynnewood, Pennsylvania. Atlantic Paper Company, hereinafter referred to as Atlantic, was a corporation organized in 1924 under the laws of Pennsylvania by Thomas J. Hare, Sr. Its principal place of business was in Philadelphia, Pennsylvania. Atlantic filed corporation income and excess profits tax returns prepared on the accrual basis covering the calendar years 1941 and 1942 with the collector of internal revenue at Philadelphia, Pennsylvania. Hare, Sr. was president of Atlantic from its incorporation until September 5, 1942, the date of his death. Petitioner came into the business in 1929 and became vice-president in 1938. He worked with his father in developing and maintaining contacts with paper mills and paper users. On June 18, 1941, Hare, Sr. was the owner of the outstanding stock of Atlantic, consisting of 998 shares. On that date such stock was sold at public auction, after *96 advertisement, and was purchased by an agent of petitioner for approximately $15,000. There was no lien upon such stock at that time, nor was the sale made on foreclosure. The purpose of such sale was to fix a value of the stock in the hands of petitioner. Petitioner was the owner of the outstanding stock of Atlantic thereafter until December 31, 1942, and was president after September 5, 1942. On December 31, 1942, Atlantic ceased doing business as a corporation, and its assets were transferred to petitioner in consideration of the surrender of its stock and the assumption of its debts. Atlantic was dissolved as a corporation on June 15, 1943. The fair market value of the assets of Atlantic transferred to petitioner as of December 31, 1942, was $48,882.49. Petitioner and his sister, Edwina Hare, as partners, thereafter operated the business formerly operated by Atlantic. On December 12, 1942, petitioner entered the armed services of the United States. He was discharged therefrom on March 8, 1946. The following table shows for the years 1934 to 1942, inclusive, the sales, net income or loss per returns, commissions paid to five salesmen and compensation paid to officers: Compensation of Officers
Commission
Net
Paid
Thos. J.
Thos. J.
Year
Sales
Income
Salesmen
Hare, Sr.
Hare, Jr.
1934
$ 523,208.42
$88,385.67 *
$ 17,556.11
$36,000.00
1935
631,298.91
386.62 *
22,050.00
26,500.00
$ 785.00
1936
623,597.40
3,181.01 *
30,000.00
1937
756,220.32
7,609.96
25,098.28
33,000.00
1,188.34
1938
786,675.40
84.76 *
23,393.49
21,000.00
10,408.33
1939
964,046.24
796.03 *
27,480.90
34,500.00
10,400.00
1940
1,035,899.72
341.32
31,166.03
36,000.00
10,466.67
1941
1,416,514.12
19,406.60
53,595.94
25,000.00
24,945.83
1942
2,098,038.53
40,130.36
118,351.69
17,013.86
50,000.00
*97 Respondent disallowed part of the deductions taken by Atlantic for salaries of the Hares, and determined deficiencies accordingly. On brief respondent concedes the reasonableness of the salary of $24,945.83 drawn by petitioner in 1941; would allow $35,000 as his salary in 1942, and, as to Hare, Sr., would allow $15,000 for 1941 and $10,000 for 1942 as deductible salaries. Petitioner and his father did all the buying of paper, passed on credits, supervised several salesmen, managed the office in which four girls were employed, and did part of the selling personally. Atlantic had a contract with its principal supplier, which furnished about 50 per cent of Atlantic's requirements. The remainder of the paper needed was procured from some five or six other mills. Petitioner and his father gave advice to customers as to the quality and kind of paper desirable for particular purposes, and sometimes took customers to the mills to discuss quality, grain and color of paper for a special order. The paper was usually made to order, shipped *98 directly to the customer and billed to Atlantic. Atlantic collected from the user, extending any credit on its own responsibility. Atlantic made sales to about fifty customers in the area from Pennsylvania to North Carolina, inclusive. Blakiston Company is a corporation engaged in the medical publishing business in Philadelphia. In 1941 and 1942 it published the Red Cross Manual for Red Cross Publications. This required a large amount of paper. Horace G. White, Jr. was the son of the owner of Blakiston Company. In 1941 White was a professor at a university and had no experience in selling paper. White placed Blakiston's orders for paper with Atlantic and was paid the full commission of 50 per cent of the net profit Atlantic was paying its regular salesmen. These sales were a large part of Atlantic's business in 1942. The supply of paper was limited in 1941 and 1942 and Atlantic could procure only 85 to 90 per cent of its requirements. Hare, Sr. was afflicted with Bright's disease. Also, he was involved in a train accident in 1940 and suffered a stroke a few days later. His left leg was affected, but he was able to walk without a crutch or cane. He continued to perform services *99 in the business. He suffered a second stroke in July 1942, and was thereafter confined to his bed until he died on September 5, 1942. Atlantic paid no dividends to its stockholders in the years 1934 to 1942, inclusive. A reasonable allowance for compensation of petitioner and Hare, Sr. for personal services actually rendered Atlantic was $39,945.83 for 1941 and $45,000 for 1942. Hare, Sr. had an account on the banks of Atlantic to which was credited his salary and to which were charged his withdrawals. In the year 1942 the charges totalled $19,528.80, of which $5,200 was for cash withdrawn, $6,394.74 for interest payments, $7,629.25 for life insurance premiums, and $304.81 for tax payments. The amount of salary credited for 1942 was $17,013.86. Charges for $513.93 were made after September 5, 1942. The amount overdrawn, $2,514.94, was charged off to the surplus account. Atlantic's income and excess profits tax return for 1939 indicated that $24,425.88 was due Atlantic from Hare, Sr. at the end of the year. The return for 1940 showed the amount of $20,658.50 as due from Hare, Sr. at the end of that year. The return for 1941 showed no amount due to or from Hare, Sr., and $889.50 *100 as due to petitioner, who was shown as the owner of all the stock. Atlantic's return for 1942 claimed a bad debt deduction of $2,514.94 for the overdraft in the account of Hare, Sr. Petitioner and his mother, Regina D. Hare, were executor and executrix of the will of Hare, Sr. Letters testamentary were granted September 22, 1942. The inventory and appraisal of the estate were completed before the end of 1942. The account as filed in November 1943 in the Orphans' Court for the County of Montgomery, Pennsylvania, showed that the personal estate of the decedent was valued at $9,246.66, the widow's exemption and accounts paid by the representatives amounted to $7,690.48, and a cash balance of $1,556.18 remained. The account shows no claim by Atlantic for the overdraft of $2,514.94 on the decedent's account; nor does it show a claim by the collector of internal revenue for federal taxes. Decedent owed federal taxes in an amount exceeding $9,000.the Orphans' Court, on being informed of the collector's claim, ordered payment to the collector of the balance then held by the representatives of the decedent. Opinion The principles governing the determination of a reasonable allowance for *101 salaries as a deduction from income are well known. They are stated succinctly in , as follows: "Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper. ; *102 ; . The situation must be considered as a whole with no single factor decisive." We think respondent's conceded allowances for salaries deductible by Atlantic for the taxable years are all that the record justifies. Petitioner's salary for 1941, which is allowed in full, was more than double the amount he had received in any year before and the respondent's allowance for 1942 is more than three times any salary paid petitioner before 1941. Even the increased volume of business, and profits, the difficulties of procuring paper, and petitioner's ownership of the corporate stock do not justify allowance of $50,000, the actual amount drawn in 1942. Petitioner's father had, for many years, drawn a salary large enough to absorb all, or nearly all, the profits of the business. In the years 1937 to 1940, inclusive, profits before executives' salaries approximated $164,000 of which about $157,000 was drawn by the Hares as salaries. Hare, Sr. was not well and had suffered a stroke in 1940. In 1941 he ceased to be a *103 stockholder and in July 1942 he suffered another stroke and was bedridden until he died in September. Although he was able to perform some important services for Atlantic in 1941 and the first part of 1942, we think the allowances of $15,000 for 1941 and $10,000 for 1942 as salaries for his services deductible in those years are ample. It is true these are substantially lower than the amounts he drew in the years 1934 to 1940, but those amounts may be considered as including an element of dividends as well as a compensation for services, and are not to be taken as the true measure of the value of those services. Atlantic would not have paid a stranger such salaries where the effect would be to deprive the stockholders of all dividends. The circumstances here present do not justify allowance of amounts larger than those now conceded by the respondent. We think respondent erred in disallowing the entire deduction taken for the overdraft in the account of Hare, Sr. The overdraft was treated as a bad debt because petitioner, knowing the state of his father's finances and being aware of the claims against his father's estate, realized that the account was uncollectible since the claim *104 of the collector of internal revenue would have priority. Respondent argues that the account was not intended as an obligation to be repaid, hence there was no debtorcreditor relationship between the parties; that no effort was made to collect it and none would be made in view of the relationship of the purported debtor and the owner of the creditors; and that if a debt, it was not worthless in 1942. An effort to collect is not necessary where it would be futile. By the end of 1942 petitioner and his mother had completed the inventory and appraisal of the estate and petitioner knew that the account was uncollectible from the assets. We think the account was a debt owing to the corporation and that it was deductible as a bad debt to the extent of the overdraft existing at the date of the death of Hare, Sr. Cases to the contrary cited by respondent are distinguishable. In , advances made to the taxpayer's secretary who later became his wife were held as not creating a debt. In , business reasons led the creditor to forego collection. However, we think the charges to the account made after September 5, 1942, amounting *105 to $513.93 and covering interest and taxes owed by Hare, Sr., were payments which petitioner allowed Atlantic to make even though he must then have known that the accrued salary would be insufficient to cover them and that they would not be collectible from the estate. Petitioner should have treated these bills as claims against the estate instead of having them paid by the corporation. As to these items the amount of $513.93 was not deductible by the corporation. The remainder of the overdraft, $2,001.01, was deductible as a bad debt. Decision will be entered under Rule 50. Footnotes
*. Indicates loss. Included in the sales shown above were sales to Red Cross Publications amounting to $109,721.34 in 1941 and $956,621.62 in 1942.↩